# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Flow-Eze Company,<br><br>Plaintiff,<br><br>v.<br><br>Method Products, PBC,<br><br>Defendant. | Case No.1:22-cv-06074 |

## COMPLAINT

Plaintiff, Flow-Eze Company, by and through their counsel Alexander I. Passo, Joanna Kopczyk, and Latimer LeVay Fyock LLC ("Plaintiff" or "Flow-Eze"), states as follows for its Complaint against Defendant Method Products, PBC ("Defendant" or "Method"):

## I. NATURE OF THE ACTION

1. Plaintiff and Defendant entered into a written contract in which Plaintiff would perform on-site printing services for the Defendant's products at one of its facilities located in Chicago, Illinois.

2. Plaintiff was induced into entering the written contract and providing such services, which required it to purchase new equipment and machinery for use at the facility and additional overhead expenses (including but not limited to, hiring and training new staff, obtaining new enterprise resource planning (ERP) software, building out new IT infrastructure at the facility and host location, and obtaining new custom built software to support the remote operations), because of Defendant's representations that the services would be on-site, and in the event of

early termination by Defendant, that the Defendant would pay Plaintiff an early termination fee as set forth in the contract.

3. Ultimately, after several years of providing Defendant with services described in the contract, the Defendant requested the Plaintiff vacate its facility.

4. After vacating the facility, Defendant significantly reduced the volume of orders it sent to Plaintiff for its printing services. Upon information and belief, Defendant is providing the same or similar services itself, which has led to the decreased volume of orders being sent to Plaintiff after leaving the facility.

5. The written contract specifically prohibited Defendant from providing the same or similar services as the Plaintiff during its term.

6. Defendant's request for Plaintiff to vacate the facility was a *de facto* termination of the agreement.

7. Plaintiff requested Defendant pay the early termination fee. However, Defendant has refused.

## II. THE PARTIES

8. Plaintiff the Flow-Eze Company ("Flow-Eze") is an Illinois corporation with a principal place of business in Illinois. Flow-Eze is in the business of providing printing services for industrial, commercial, retail, and promotional products on the behalf of its customers, which include publicly traded companies.

9. Defendant, Method Products, PBC ("Method") is a Delaware public benefit company with a principal place of business of San Francisco, California. Method Products manufactures,

distributes, and sells household cleaners and laundry supplies. One of its most widely known products (especially after the pandemic) is its hand soap product depicted below:



### III. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court has personal jurisdiction over Defendant because Defendant has contracted with Plaintiff to perform services and business in this state, contracts to supply goods in this state, and supplies goods in this state.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Plaintiff and Defendant entered into a written contract whereby services and business would be performed in this judicial district. Venue is further proper in this district because of the forum selection clause incorporated in the written contract amongst the parties.

## IV.  STATEMENT OF FACTS

### A.  Printing Services Contract Between Flow-Eze and Method.

13. On or around July 5, 2017, Flow-Eze and Method entered into a Printing Services Agreement (the "Contract") under which Flow-Eze was to provide printing services to Method under the terms of the Contract. A true and correct copy of the Contract is attached hereto as **Exhibit A**. **Ex. A**, p. 1.

14. A critical component of the Contract and its negotiation was the agreement of the parties that Flow-Eze was to provide on-site printing services at Method's facility located at 720 E. 111 St., in Chicago, Illinois (the "Southside Soap Box"). *See, e.g.* **Ex. A**, p. 3, § 2.3. Further, under the Contract, Flow-Eze had the exclusive right to perform the services in the Southside Soap Box. *See* **Ex. A**, p. 19, § 16. Specifically, Method retained only "the right to procure from third parties, or perform itself outside of the [Southside Soap Box], the same or similar type of services [. . .]" under the Contract. **Ex. A**, p. 19, § 16.

15. In order to facilitate Flow-Eze's performance under the Contract, Method was obligated to provide electricity, natural gas, compressed air, support services for movement of the product at the facility between areas, and further obligated to allocate up to 2,106 square feet of space in the Southside Soap Box for Flow-Eze. **Ex. A**, p. 10, §4.1(c).

16. In the event of early termination of the Contract, which was contemplated in the Contract, the Contract required that Method pay the costs of relocating Flow-Eze from its facility. **Ex. A**, §4.1(c), p. 10. Specifically, the Contract states that "[i]n the event that Method wishes to relocate the licensed space to another area, any and all expenses will be at the sole expense of Method." *Id*.

17. The Contract was to run for a seven-year term beginning on July 5, 2017, unless terminated by either party pursuant to Section 13 therein. **Ex. A**, p. 10, § 6. The Contract states:

> This [Contract] shall commence as of the Effective Date and shall continue thereafter for a period of seven (7) years, unless sooner terminated pursuant to Section 13 (the "Term"). Either party may initiate discussions and negotiations with the other party to renew this [Contract] by providing written notice to the other party, not less than ninety (90) days prior to the expiration of the Term, of its desire to renew this [Contract]; provided that neither Party shall be under any obligation to renew or extend this [Contract].

*Id*.

18. Under Section 13 of the Contract, Method was permitted to terminate the Contract, with or without cause, if Method provided at least two hundred and forty (240) days' prior written notice to Flow-Eze. **Ex. A**, pp. 15-16, § 13.1. Upon such notice, Method was obligated to pay Flow-Eze an early termination fee as outlined in the schedule contained in the Contract. Specifically, the Contract states that:

> Method may terminate this [Contract], in whole or in part, at any time without cause, by providing at least two hundred and forty (240) days' prior written notice to the other party; provided, that if Method terminates this Contract without cause during any of the following Termination Periods in the table below, Method will pay to Service Provider an Early Termination Fee in the amount indicated next to the applicable Termination Period below [.]

*Id*.

19. The Contract further permits, in relevant part, that either Flow-Eze or Method may terminate the Contract if the non-moving party materially breached the Contract and the moving party provided written notice and an opportunity to cure. **Ex. A**, p. 16, § 13.2. Specifically, the Contract states:

> Either party may terminate this [Contract], effective upon written notice to the other party (the "**Defaulting Party**"), if the Defaulting Party:
>
> a) materially breaches this [Contract], and such breach is incapable of cure, or with respect to a material breach capable of cure, the Defaulting Party does not cure such breach within thirty (30) days after receipt of written notice of such breach.

*Id*. (emphasis in original). Specifically, upon written notice, Method was allowed under the Contract to limit or remove Flow-Eze's access to the Southside Soap Box **only** if Flow-Eze was

in material breach of the Contract after 30 days written notice and Flow-Eze's failure to cure within 30 days of receipt of notice of that breach. **Ex. A**, p. 10, § 4.1(c) Specifically, the Contract provides that:

> In the event of a material breach of the [Contract], and such breach is incapable of cure, in Method's sole discretion, or if [Flow-Eze] does not cure such breach within thirty (30) days after receipt of written notice of such breach, Method may limit [Flow-Eze]'s access to the facility with 30 days notice.

*Id*.

The Contract does not define material breach or cure. However, read in conjunction with the "Termination; Effect of Termination," provisions therein and outlined above, "effective upon written notice to the other party," a defaulting party has 30 days to cure a breach. **Ex. A**, pp. 16-17, § 13.2(a).

20. The notice provision of the Contract reiterated that any notice to the other party must be in writing. **Ex. A**, p. 20, § 18.4.

21. The early termination fee changes based on what year of the Contract the termination occurs. **Ex. A**, p. 16, § 13.1. Specifically, the schedule for the early termination fee in the Contract states:

| Year | Termination Period | Early Termination Fee |
|---|---|---|
| 1 | Commencing on the Effective Date to the day immediately preceding the first anniversary of the Effective Date, inclusive | $976,468.24 |
| 2 | Commencing on the first anniversary of the Effective Date to the day immediately preceding the second anniversary of the Effective Date, inclusive | $744,734.49 |
| 3 | Commencing on the second anniversary of the Effective Date to the day immediately preceding the third anniversary of the Effective Date, inclusive | $683,342.34 |
| 4 | Commencing on the third anniversary of the Effective Date to the day immediately preceding | $495,399.97 |

| | | |
|---|---|---|
| | the fourth anniversary of the Effective Date, inclusive | |
| 5 | Commencing on the fourth anniversary of the Effective Date to the day immediately preceding the fifth anniversary of the Effective Date, inclusive | $323,692.98 |
| 6 | Commencing on the fifth anniversary of the Effective Date to the day immediately preceding the sixth anniversary of the Effective Date, inclusive | $176,495.71 |
| 7 | Commencing on the sixth anniversary of the Effective Date to the day immediately preceding the seventh anniversary of the Effective Date, inclusive | $64,244.47 |

*Id*.

**B. Events Surrounding Method's Material Breach.**

22. Flow-Eze performed under the Contract in the Southside Soap Box until on or around March 1, 2021.

23. On or around early January 2021, Method notified Flow-Eze that it no longer could operate in the Southside Soap Box Facility and that it must vacate.

24. However, operating outside of the Southside Soap Box under the Contract was in contravention of the purpose of the relationship between the parties in which Flow-Eze would provide on-site printing services to Method. Indeed, Flow-Eze invested considerable time, effort, and resources to Method as a result of this point and the termination Flow-Eze's operation within the Southside Soap Box was a rationale under which the Contract included an early termination fee. For example:

    A. Flow-Eze hired and trained staff that were local to the Pullman neighborhood surrounding the Southside Soap Box.

    B. Flow-Eze hired and trained a staff member that would function as the on-site lead for Flow-Eze operations in the Southside Soap Box.

25. In response to Method's request, Flow-Eze sent written correspondence to Method's agent dated January 22, 2021, a copy of which was also subsequently emailed to Method. A true and correct copy of this correspondence ("January 2021 Letter") is attached hereto as **Exhibit B**.

26. As outlined by Flow-Eze in its January 2021 Letter, Method failed to provide Flow-Eze with notice and information due to Flow-Eze under the Contract. Specifically, Method failed to provide Flow-Eze with the following:

> A. A written notice of termination or of default under the terms of the Contract;
>
> B. At least two hundred and forty days of prior written notice under the Contract, if Method was terminating the Contract without cause;
>
> C. The information necessary for Flow-Eze to transition its on-site operation to a facility outside the Southside Soap Box in a timely manner. Specifically, Method failed to provide Flow-Eze with the data Flow-Eze needed in order to efficiently wind down its operations in terms of equipment relocation, staffing changes, and changes to on-site state operations.

27. Flow-Eze represented that it desired to perform under the Contract in a location outside the Southside Soap Box, provided that Method pay Flow-Eze the termination fee due under the Contract so that Flow-Eze could recoup its investments relating to performing under the Contract at the Southside Soap Box. **Ex. B**, pp. 1-2.

28. In the January 2021 Letter, Flow-Eze represented that it invested significant funds in the following:

> support, software and software development costs, systems integration, support equipment, spare parts, customized equipment, incoming rigging/install costs, 3rd party contractual obligations (IT/telecom, stacker), costs for facility improvements (such as fiber optic runs, electrical installs), severance and unemployment costs.

**Ex. B**, p. 2. As a result, Flow-Eze incurred substantial opportunity costs..

29. Further, Flow-Eze represented in the January 2021 Letter that it vested thousands of hours of management time in order to allow for successful operation at the Southside Soap Box specifically on the commitment from Method of a long-term on-site Contract. **Ex. B**, p. 2. Flow-Eze further outlined the purchase of an additional machine to replace an inadequate screen-printing line at the Southside Soap Box. At Method's request, the additional machine was put for use at a Flow-Eze facility for the sole purpose of printing Method's products, and not installed on site at the Southside Soap Box. Method never paid for the installation of the newly purchased machine.

30. Flow-Eze requested that Method respond to the January 2021 Letter by February 5, 2021. **Ex. B**, p. 2.

31. Method did not respond to the January 2021 Letter.

32. On or about March 1, 2021, Flow-Eze vacated the Southside Soap Box per the request of Method.

33. After moving from the Southside Soap Box facility, Method reduced the production volumes it sent to Flow-Eze historically throughout the Contract, and its request for Flow-Eze to vacate the space was a *de facto* termination of their Contract.

34. Upon information and belief, Method is performing the services considered under the Contact itself at the Southside Soap Box facility, which has resulted in the decrease of volume of orders to Flow-Eze.

35. Method did not respond to the January 2021 Letter, therefore, on August 30, 2021, Flow-Eze sent further follow-up correspondence in compliance with the Contract. A true and correct copy of this correspondence ("August 2021 Letter") is attached hereto as **Exhibit C**.

36. In its August 2021 Letter, Flow-Eze detailed Method's failure to provide Flow-Eze with the materials necessary for Flow-Eze's performance under the Contract and the oral promises

agents of Method made in order to induce Flow-Eze into continuing its performance under the Contract outside the Southside Soap Box facility. Specifically, the August 2021 Letter detailed:

    A.    Method's previous promises to relocate Flow-Eze to another location in the Southside Soap Box, instead of ejecting Flow-Eze entirely.

    B.    Method's promise to replace the 10oz FHW bottle format Flow-Eze was tasked with screen printing with other decorating business from Method, including that of the including: 11.5oz HDPE Handwash, 18oz HDPE Dish, 18oz Bodywash, and 3.4oz Bodywash. Method shared production volumes with Flow-Eze and communicated that they would easily offset any business Flow-Eze would lose as a result of Method's unilateral decision to label instead of direct screen print the 10oz FHW bottle.

    C.    A representative of Method represented that Method would provide Flow-Eze with approximately $180,000 to offset the costs to Flow-Eze of changing facilities out of the Southside Soap Box and locating another facility in order for Flow-Eze to continue production under the Contract.

37. On or around December 2021, after further prompting by Flow-Eze, Method responded as follow-up to Flow-Eze's August 2021 Letter.

38. In its response, Defendant maintained that it did not breach the Contract through its unilateral decision to remove Flow-Eze from the Southside Soap Box in March 2021.

39. Indeed, Defendant conveyed to Flow-Eze that the Contract was not terminated by Method and that Method did not intend to terminate the Contract.

40. Method further reiterated the conveyances previously made to Flow-Eze by Method's agents, stating in short that it would work with Flow-Eze to secure additional volume opportunities

were possible. Such representations were false as no additional volume opportunities have been provided to Flow-Eze.

41. Despite Method's representations, Flow-Eze has yet to be compensated for the full amount of the money it expended to move operations outside of the Southside Soap Box Facility and the increased costs associated with operating outside of the Southside Soap Box Facility, despite the Contract specifically providing for such costs under these circumstances. Specifically, Method failed to compensate Flow-Eze for costs stemming from the following, among other things:

    A. The costs associated with locating, leasing, and operating a facility outside of the Southside Soap Box Facility; and

    B. The costs associated with establishing and maintaining support operations to the Southside Soap Box Facility.

42. Further, as a result of Method's breach of the Contract, Flow-Eze has suffered additional damages as a result of being forcibly removed from the Southside Soap Box, specifically in the form of consequential damages and costs accrued as a result of the relocation.

## COUNT I – BREACH OF WRITTEN CONTRACT

43. Plaintiff Flow-Eze Company incorporates by reference herein the allegations previously set forth above in paragraphs 1 through 42 as paragraph 43 of this Complaint.

44. The Contract is a valid and enforceable contract.

45. Plaintiff satisfactorily performed all of its obligations under the Contract.

46. Without legal justification or excuse, Method materially breached the Contract with Plaintiff by failing to perform its obligations thereunder, including but not limited to:

    A. Providing Flow-Eze space within the Southside Soap Box facility to perform its on-site printing services for Method;

    B. Performing the same or similar services as Flow-Eze under the Contract;

    C. Failing to operate in good-faith and deal fairly under the Contract; and

    D. Effectively terminating the Contract and failing to pay the termination fee.

47. As a direct and proximate result of Defendant's breach of the Contract, Plaintiff has suffered damage in an amount excess of $495,399.97, as contemplated by the termination fee under the Contract, and additional lost profits as a result of the diversion of orders to Plaintiff after it vacating Southside Soap Box.

    WHEREFORE, Plaintiff Flow-Eze Company requests that a judgment be entered against Defendant, Method Products PBC, in an amount in excess of $495,399.97, plus prejudgment interest at the statutory rate allowed under Illinois law, Plaintiff's statutory costs, and any such other relief this Court deems equitable and just.

## COUNT II – PROMISSORY ESTOPPEL (in the alternative)

48. In the alternative to Count I, Plaintiff Flow-Eze asserts this claim for promissory estoppel against Defendant.

49. Except to the extent inconsistent with the relief requested in this Count, Plaintiff Flow-Eze incorporates by reference each and every allegation set forth above.

50. At Defendant's request, Plaintiff Flow-Eze provided goods, services and labor in connection with the performance under the Contract.

51. Defendant made unambiguous promises to Plaintiff Flow-Eze for the purpose of inducing Plaintiff Flow-Eze to provide goods, services and labor in connection with the production of the silk-screened bottles at the Southside Soap Box. Specifically, Method's agents promised to pay for additional goods, services and labor to be provided by Flow-Eze in order to induce Flow-Eze to avoid enforcement of its rights under the Contract.

52.     Defendant Method then continued to promise Plaintiff that it would make all payments due for the move of Flow-Eze's screen-printing operations outside of the Southside Soapbox while promising Flow-Eze additional work beyond that originally contemplated by the specifications of the Contract.

53.     Plaintiff Flow-Eze reasonably relied upon such promises made by each Defendant and provided the goods, services and labor necessary with the production of the silk-screened bottles at the Southside Soap Box and at its own facilities.

54.     Plaintiff Flow-Eze's reliance on Defendant's promises was expected and foreseeable by Defendant.

55.     Defendant's promises and Plaintiff Flow-Eze's reliance thereon resulted in detriment and damages to Plaintiff and Plaintiff is entitled to recover damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Flow-Eze Company requests that a judgment be entered against Defendant, Method Products PBC, in an amount in excess of $495,399.97, plus prejudgment interest at the statutory rate allowed under Illinois law, Plaintiff's statutory costs, and any such other relief this Court deems equitable and just.

Respectfully submitted,

Dated: November 3, 2022

/s/ Alexander I. Passo
One of Plaintiff's Attorneys

Alexander I. Passo - #6317519
Joanna Kopczyk
Latimer LeVay Fyock LLC
55 West Monroe Street, Suite 1100
Chicago, Illinois 60603
apasso@llflegal.com
jkopczyk@llflegal.com